UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **BRIAN MELENOFSKY**,<br><br>Plaintiff,<br><br>vs.<br><br>**AETNA LIFE INSURANCE COMPANY**,<br><br>Defendant. | 20-CV-11222-TGB-RSW<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Brian Melenofsky suffered a heart attack and subsequently applied for both short- and long-term disability benefits through his employer. Both were initially approved by Defendant Aetna Life Insurance Company ("ALIC"), the benefits plan administrator. On November 21, 2019, after determining that his health outlook had improved, ALIC terminated long-term disability benefits. Plaintiff filed this lawsuit alleging the termination of his benefits was in violation of ERISA. Defendant argues that it followed the necessary protocols under the law for re-evaluating his condition and that Plaintiff cannot meet the standard for liability. For the reasons that follow, ALIC's Motion for Summary Judgment is **GRANTED** and Plaintiff's Motion is **DENIED.**

1

## I. BACKGROUND

### A. Plaintiff's health

Plaintiff Brian Melenofsky was a senior application developer for TriNet HR III, Inc. ECF No. 27, PageID.945. He had a heart attack (his second) on September 14, 2017, when he was fifty-seven years old. *Id.*

He visited cardiologist Dr. Aziz Alkatib for the first time on September 22, 2017. Dr. Alkatib's treatment notes from that visit indicate that Mr. Melenofsky has a prior history of hypertension, Type II diabetes, coronary artery disease, hyperlipidemia, obesity, and one prior heart attack in 2003. Under "Tests Performed," his notes also detail the results of the left heart catheterization performed on September 14, as well as the results of an echocardiogram performed on September 15: "normal LV size, mild LV hypertrophy, mildly reduced global systolic function, EF estimated at 45%." Plaintiff reported some heaviness in his legs when walking, shortness of breath, and fatigue, but no chest pain or other symptoms. Dr. Alkatib's assessment notes are categorized according to Mr. Melenofsky's various diagnoses and/or symptoms, and generally involve medication recommendations and some behavioral/lifestyle changes such as a low salt diet. One specific area for follow-up is a potential second surgery. ECF No. 17-4, PageID.674-76.

At Plaintiff's next visit on November 3, 2017, he stated that he had no chest pain, but that he still became short of breath and fatigued easily. He and Dr. Alkatib agreed that he would undergo the surgery, a left heart

catheterization procedure and placement of a stent to address his remaining symptoms related to coronary artery disease, specifically the 80% narrowing of one of his stents ("RCA with 80% mid in-stent restenosis"). Dr. Alkatib's other recommendations remained unchanged. ECF No. 17-4, PageID.671-73.

This procedure was performed on December 28, 2017. At the next follow-up visit on January 12, 2018, Dr. Alkatib noted that the left heart catheterization and stent placement was successful, and that "the stenosis was reduced from 80% to 0%. On today's visit the patient is asymptomatic, we recommend to continue with risk factors behavioral modifications and continue other current management." ECF No. 17-4, PageID.668-70. The rest of Dr. Alkatib's assessment and recommendations remained largely unchanged. Mr. Melenofsky no longer complained of general shortness of breath or fatigue. His only remaining respiratory symptom was dyspnea on exertion—a feeling of inability to get enough air during exercise.

He received another echocardiogram on February 4, 2019 (ECF No. 17-4, PageID.681) that according to Dr. Alkatib's notes showed "normal LV systolic function" and an ejection fraction ("EF") of 55-60%. This was an improvement from the echocardiogram taken immediately after his heart attack, which showed an EF of 45%. ECF No. 17-4, PageID.626. The treatment notes from the next follow-up visit on February 22 indicate that Mr. Melenofsky was "asymptomatic" with regards to coronary artery

3

disease; Dr. Alkatib's recommendations again focused on diet, exercise, and medication and were largely unchanged from previous visits. ECF No. 17-3, PageID.624-26.

Plaintiff saw Dr. Alkatib for regular follow-ups: notes from May 2018, September 2018, February 2019, and August 2019 visits are all in the record. All of these notes indicate Mr. Melenofsky still experienced dyspnea on exertion, but no chest pain, shortness of breath, or fatigue. The treatment recommendations continued to focus on diet, exercise, and medication, and were essentially unchanged from visit to visit.

Dr. Alkatib also submitted two "Attending Provider Statements" on Mr. Melenofsky's behalf to ALIC over the course of these follow-up visits: one on December 11, 2018 (ECF No. 17-4, PageID.723-24), and one on April 5, 2019 (ECF No. 17-4, PageID.721-22).[1] The first Attending Provider Statement indicates a treatment plan of "medical management," and that Mr. Melenofsky's symptoms include "shortness of breath, dyspnea on exertion, chest pain." It states that his symptoms "worsen with stress, physical activity" and that he "can't return to work." The second Attending Provider Statement says that he is "incapable of minimal activity" and that he "continues to be symptomatic with

---

[1] In some parts of the record, this note is referred to as the "9/5/2019 Attending Provider Statement." The Court agrees with Defendant's conclusion that based on the contents of the note, the correct date must be April, and that the handwriting makes the "4" look like a "9", leading to the confusion. *See* ECF No. 27 at n.10, PageID.956.

4

shortness of breath, chest pain, dyspnea on exertion despite being managed on medication" and that he "is stable, however not at full recovery . . . condition is lifetime."

### B. ALIC's disability plan

The disability plan at issue here, issued by Mr. Melenofsky's employer and administered by ALIC, is governed by ERISA. It provides long-term disability benefits for up to twenty-four months to qualified participants unable to perform the material duties of their own occupation. After twenty-four months, a claimant must establish they cannot perform any reasonable occupation to continue receiving benefits. ECF No. 27, PageID.945; *see also* Policy Documents, ECF No. 17-1.

### C. Initial grant and subsequent reversal of benefits

After his heart attack, Mr. Melenofsky applied for disability benefits through this employer-sponsored ERISA plan. He was initially approved for short-term disability benefits. On March 7, 2018, ALIC conducted an internal clinical assessment to determine his eligibility for long-term disability. In response to the question "do you believe [claimant] would be able to safely perform sedentary, high stress occupational duties on a consistent basis?" the reviewer responded, "not at this time." The reviewer further noted that Mr. Melenofsky "is unable to work in any occupation at this time but needs to be reevaluated in the future once [he] has recovered from recent PTCA and his cardiac management has successfully been optimized." ECF No. 17-2,

5

PageID.343. His long-term disability benefits were approved beginning March 14, 2018. ECF No. 17-2, PageID.351. After this determination, he had two follow-up calls on March 7, 2019 and July 31, 2019 with ALIC employees to check in on his health and plans to return to work. *See* ECF No. 17-2, PageID.377; PageID.384-85.

On September 9, 2019, ALIC referred Mr. Melenofsky's case for an internal clinical review, with the reason for review listed as "ongoing claim assessment of function and/or work capacity." ECF No. 17-2, PageID.404. This review was completed on September 26, 2019: the reviewer indicated that additional follow-up and documentation were needed regarding Mr. Melenofsky's functional capabilities to be able to answer the questions posed in the referral. The documents listed as considered by the reviewer include only the two Attending Provider Statements; none of his treatment notes were considered. The review also stated that Dr. Alkatib's Attending Provider Statements were "not beneficial without supporting physical exam/diagnostic test reports." *Id.* at PageID.411. The clinician who completed the review listed specific follow-up tasks, including having an in-depth phone conversation with Mr. Melenofsky and obtaining treatment notes from his various providers that included the results of physical exams. *Id.* at PageID.412.

On October 11, 2019, an ALIC employee conducted an interview by phone with Mr. Melenofsky. Notes from the interview indicate that he changed some of his activity levels but "doesn't have problem

6

functioning" and that he "really hasn't had any stress since he's quit work." *Id.* at PageID.417.

On October 24, 2019, the file was re-referred for an internal clinical review. This reviewer had access to updated records, including the September 2018, February 2019, and August 2019 treatment notes from Dr. Alkatib, the February 2019 echocardiogram, and the two Attending Provider Statements. *Id.* at PageID.423. The reviewer concluded that the "medical data received today does not support that he would be unable to engage in sedentary activity or even light activity based on the absence of abnormalities via office visits." They further noted that "although the provider has given an APS stating he cannot engage in any work activity, the medical does not support this. In fact, the provider is recommending that he engage in exercise." *Id.* at PageID.424.

On October 29, 2019, the reviewer from ALIC reached out by fax to Dr. Alkatib requesting clarification regarding the Attending Provider Statement he submitted on April 5, 2019. She noted her assessment that "the medical currently on file does not support that he should be out of work" but asked for his input so that the file could be reevaluated. ECF No. 17-2, PageID.269. On November 7, he left a voicemail that he had received the letter and "thought it would be good to discuss over the phone." The reviewer called back Dr. Alkatib's office and was told that he was unavailable. ECF No. 17-2, PageID.426. The reviewer ultimately noted that they "sent clarifying questions to treating provider on 10/29/19

7

and attempted [follow-up] calls on 11/5 and 11/12," and that "as there has been no response to date, and as there is no current medical documentation on file supporting preclusion from normal sedentary level work activity, I am recommending this claim for termination." *Id.* at PageID.433. Mr. Melenofsky's long-term disability benefits were terminated on November 21, 2019. ECF No. 17-2, PageID.272-73.

Meanwhile, Mr. Melenofsky had also applied for social security disability benefits. These were initially denied, then granted after a hearing in front of an ALJ. He received this favorable determination on November 20, 2019. ECF No. 17-2, PageID.437; *see also* ALJ Decision Letter, ECF No. 17-3, PageID.578-81.

### D. Appeal of termination

Mr. Melenofsky appealed ALIC's termination of benefits. ECF No. 17-2, PageID.288. At this stage, ALIC engaged an independent consultant, Dr. Maitrayee Vadali,[2] to review Mr. Melenofsky's file. ECF No. 17-2, PageID.292-297. Records that she considered include the social security determination, Dr. Alkatib's treatment notes and Attending Provider Statements, and the February 2019 echocardiogram report. *Id.* at PageID.292-94. She also requested clarification from Dr. Alkatib regarding his findings: the record indicates that Dr. Vadali attempted to contact Dr. Alkatib on March 16 and March 25, 2020, without a response.

---

[2] Sometimes spelled "Kadali" in the record.

In her review, Dr. Vadali concluded that Mr. Melenofsky "should be able to pursue a light occupation full-time" and that "there is no clear evidence that the claimant has symptoms that clearly correlate with the presence of documented stress." She also noted there was no information in the social security decision letter that impacted her opinion. *Id.* at PageID.295-96. She indicated that she did not agree with the restrictions and limitations outlined by Dr. Alkatib given the medical evidence provided, though she would recommend some lifting restrictions on Mr. Melenofsky given his history of heart disease. *Id.* at PageID.297.

Dr. Alkatib was contacted by ALIC on April 3 with a copy of Dr. Vadali's final review and asked to indicate whether he agreed or disagreed with it within ten days. ECF No. 17-2, PageID.291. He responded on April 9, 2020 by re-sending medical records from 2017 but did not provide any new medical information or any response to the question whether he agreed or disagreed with the independent evaluation. ECF No. 17-2, PageID.300.

On April 13, 2020, ALIC denied Mr. Melenofsky's appeal, stating that "as the clinical evidence does not support a functional impairment that prevented your client from performing the material duties of his own occupation . . . the decision to terminate his claim . . . was appropriate." In its decision letter, it included the evaluation from Dr. Vadali and also noted that it had considered Mr. Melenofsky's award of social security disability benefits in its decision. ECF No. 17-2, PageID.299-300.

9

In response to that denial, Plaintiff filed suit under ERISA. The matter is now before the Court on the parties' cross motions for judgment. Pursuant to Eastern District of Michigan Local Rule 7.1(f)(2), the motions will be evaluated based on the briefs and the administrative record.

## II. STANDARD OF REVIEW

ERISA creates a right of action by a participant or beneficiary of a covered pension plan to recover benefits due under the plan. 29 U.S.C. § 1132(a)(1)(B). The Supreme Court has held that generally, "a denial of benefits challenged under section 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Here, the parties are in agreement that the Plan vests the administrator with discretionary authority to determine eligibility for benefits or otherwise construe the terms of the plan.[3] *See* Pl.'s Mot., ECF No. 25, PageID.911; Def.'s Mot., ECF No. 27,

---

[3] In 2007, Michigan banned the use of discretionary clauses in insurance policies. *See* Mich. Admin. Code r. 500.2202(b). However, this rule only applies when such clauses appear in certain forms, generally understood to be contract documents. Here, the relevant clause appears in the plan's summary documents in the "General Provisions" section. ECF No. 17-1, PageID.143. Courts have determined that discretionary clauses that appear in plan summary documents are not barred by the statute. *See Osobka v. Metro. Life Ins. Co.*, No. 16-12311, 2017 WL 3668498, at *4 n.4 (E.D. Mich. Aug. 25, 2017) (citing *Hess v. Metro. Life Ins. Co.*, 91 F. Supp.

10

PageID.960. As such, the Court will review Defendant's decision under the deferential arbitrary and capricious standard. *See Perry v. United Food & Comm'l Workers District*, 64 F.3d 238, 242 (6th Cir. 1995); *Perez v. Aetna Life Insurance Co.*, 150 F.3d 550, 555 (6th Cir. 1998).

A decision reviewed according to the arbitrary and capricious standard must be upheld if it is "rational in light of the plan's provisions." *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997). An administrator's decision will be upheld under this standard "when it is possible to offer a reasoned explanation, based on the evidence" for that particular outcome. *Calvet v. Firstar Finance, Inc.*, 409 F.3d 286 (6th Cir. 2005). By extension, an administrator's decision "can be overturned only upon a showing of internal inconsistency, bad faith, or some similar ground." *Magdziak v. Metro. Life Ins. Co.*, 920 F. Supp. 2d 782, 790 (E.D. Mich. 2013) (citations omitted). For example, "an administrator abuses its discretion when it engages in 'selective review of the administrative record' to justify a decision to deny coverage." *Id.* (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)).

### III. ANALYSIS

Plaintiff makes four arguments as to why ALIC's decision was arbitrary and capricious. These arguments map to the "lodestars" the Sixth Circuit has indicated should guide a court's review of a claim of

---

3d 895, 902 (E.D. Mich. 2015). Therefore, the correct standard of review is still arbitrary and capricious.

denial of benefits under ERISA when the arbitrary and capricious standard applies: "the quality and quantity of the medical evidence; the existence of any conflicts of interest; whether the administrator considered any disability finding by the Social Security Administration; and whether the administrator contracted with physicians to conduct a file review as opposed to a physical examination of the claimant." *Shaw v. AT & T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 547 (6th Cir. 2015) (citing *Fura v. Fed. Express Corp. Long Term Disability Plan*, 534 Fed. Appx. 340, 342 (6th Cir. 2013)) (internal quotations omitted). The Court will review each in turn.

### A. Review of evidence

Mr. Melenofsky's first argument is that ALIC selectively reviewed the medical evidence in his case to arrive at its decision. ECF No. 25, PageID.912. He lists the medical conditions documented in Dr. Alkatib's treatment notes as evidence that ALIC ignored this information and focused only on its internal reviews in deciding to terminate benefits.

The record does not strongly support this assertion. All of ALIC's internal documentation, including the two internal reviews conducted of Mr. Melenofsky's file, clearly list the records that were considered at various stages of review. The first internal reviewer declined to decide whether Mr. Melenofsky should be continued as eligible for disability, but rather noted the need for more documentation. Such a judicious approach—holding off on making a decision pending the receipt of

12

relevant information—is hardly arbitrary and capricious. ALIC went on to obtain additional documentation, and its reviewers cited both Dr. Alkatib's treatment notes as well as his two Attending Provider Statements in their analysis.

ALIC points out that it had to resolve inconsistencies between key pieces of evidence: both Attending Provider Statement forms state that Mr. Melenofsky is short of breath, has chest pain, and can only engage in minimal activity, but the physician's treatment notes for the visits occurring immediately prior to each Attending Provider Statement do not list similar symptoms or limitations. *See* ECF No. 27, PageID.952. The fact that ALIC chose to assign more credibility to the treatment notes, and less to the Attending Provider Statement, does not mean that ALIC *ignored* such provider forms—indeed, the Statements are quoted by various reviewers. ALIC also made repeated attempts, both during its initial reviews and after Mr. Melenofsky appealed his determination, to contact Dr. Alkatib to discuss his Attending Provider Statements and allow an explanation as to why those statements did not correspond to the medical conditions recorded in the treatment notes. Dr. Alkatib's only response, other than a voicemail indicating that he would prefer to discuss the matter over the phone, was to forward Mr. Melenofsky's treatment records from 2017, which would do little to elaborate on the state of his medical condition at the time of the review.

13

Mr. Melenofsky relies heavily on a list of his underlying conditions, many of which he was suffered from throughout the pendency of his claim. ECF No. 25, PageID.914. But he does not point to evidence in the record that indicates *those* conditions are the ones that qualified him for long-term disability benefits in the first place. The Court does not find the quality and quantity of medical evidence considered by ALIC in this case, nor ALIC's review of that evidence, to be so deficient as to give this lodestar factor significant weight.

### B. Conflict of interest

Next, Mr. Melenofsky argues that ALIC's dual status as plan administrator and decisionmaker regarding whether an individual will receive benefits creates a sufficiently problematic conflict of interest that his motion should be granted. ECF No. 25, PageID.914.

The Supreme Court has stated that "the fact that a plan administrator both evaluates claims for benefits and pays benefits claims" creates a conflict of interest. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008). The significance of this factor depends on the "circumstances of the particular case." *Id.* at 108. Accordingly, the Sixth Circuit cautions courts to be "particularly vigilant" when reviewing decisions of such dual-status plan administrators. *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 n.4 (6th Cir. 2000). But the existence of such a process does not in and of itself mean that ALIC's decision was flawed; a plaintiff must put forward "significant evidence"

14

that the conflict of interest influenced the insurer's decision. *Osborne v. Hartford Life & Acc. Ins. Co.*, 465 F.3d 296, 300 (6th Cir. 2006).

Mr. Melenofsky notes that the specialist employed for the file review on appeal, Dr. Maitreyee Vadali, has done a number of such reviews for ALIC and that she is paid by the hour for her work. ECF No. 25, PageID.916. But the employment of physician consultants on a per-hour basis to review such files is standard practice in the insurance industry, and there is no evidence that Dr. Vadali routinely finds in favor of ALIC even if she has frequently reviewed their case files. Although he states that Dr. Vadali reviewed thirty-three files for ALIC in 2019 and another nineteen files in 2020, there is nothing determinative about these numbers—the Court has not found, and Plaintiff has not cited, any cases that delineate a threshold number of reviews for the same insurer beyond which there is some strong indicator of a conflict of interest. Without additional details as to what makes her involvement as a file reviewer suspect, or clear indications that her file review was deficient, the court does not find this argument persuasive. *Cf. Shaw,* 795 F.3d at 551 (finding strong evidence of a potential conflict of interest when file review by doctor ignored key evidence, and when doctor was also involved in several lawsuits where he consistently made decisions in favor of the same insurer).

15

Based on the information before the Court, there is minimal evidence indicating ALIC's conflict of interest led it to act in an arbitrary and capricious manner.[4]

### C. Consideration of social security opinion

Third, Mr. Melenofsky points to the favorable outcome of his social security disability case, arguing that ALIC must have disregarded this opinion in denying his appeal. ECF No. 25, PageID.917. ALIC counters that it is merely required to consider, not follow, any social security determinations, and that the record before the ALJ in the social security proceeding was different than what ALIC considered in deciding Mr. Melenofsky's appeal, as were the legal standards that applied. ECF No. 27, PageID.968.

A favorable social security determination "does not make [a claimant] automatically entitled to benefits under an ERISA plan, since the plan's disability criteria may differ from the Social Security Administration's." *DeLisle v. Sun Life Assur. Co. of Canada,* 558 F.3d 440, 445-46 (6th Cir. 2009) (citing *Whitaker v. Hartford,* 404 F.3d 947, 949 (6th Cir. 2005)). While a favorable social security decision is not

---

[4] The Court does not assign great weight to Mr. Melenofsky's argument that ALIC was "shopping for multiple internal reviewers." ECF No. 25, PageID.915. Although the record indicates that the employee assigned to manage his claim changed several times, there is no indication that these changes were any more than administrative ones. The two individuals who actually conducted his internal file reviews were not these claim handlers; they were both medical professionals.

"meaningless," it is still one factor among many for the Court to consider in determining whether an insurer acted in violation of ERISA. *Id.*

ALIC's denial letter regarding Mr. Melenofsky's appeal states that his social security decision was considered in the file review conducted in response to his appeal. ECF No. 17-2, PageID.272-73. Dr. Vadali also cites the social security decision in her analysis. *Id.* at PageID.295-96. ALIC also notes significant ways in which the analysis performed by the social security ALJ, and the information available to him, was different than the information ALIC relied upon in making its decision. ECF No. 27, PageID.969-70. ALIC has met its requirements under the law, and this factor does not indicate that ALIC acted arbitrarily and capriciously.

### D. Lack of physical examination

Lastly, Mr. Melenofsky argues that ALIC should have conducted an independent medical examination ("IME") of him when considering his appeal of denial of benefits, and that its decision merely to conduct a file review with a contracted physician instead is evidence in favor of his motion. ECF No. 25, PageID.919. ALIC argues that the file review conducted by Dr. Kadali was sufficiently thorough and well-reasoned to provide a basis for its decision, particularly when combined with other evidence in his record. ECF No. 27, PageID.965.

This is the weakest factor for ALIC's position: given the conflict between Dr. Alkatib's notes and his Attending Provider Statements, ALIC's inability to reach him for further clarification, and the lack of

17

relevant evidence from other medical providers in Mr. Melenofsky's file, it would have been reasonable for ALIC to require a physical exam to support its conclusions regarding Mr. Melenofsky and insulate itself against a charge of arbitrary and capricious decision-making.

But this is just one factor among four, and considering the entire record, the Court finds that there is a "reasoned explanation, based on the evidence" for the outcome reached by ALIC. *Calvet v. Firstar Finance, Inc.*, 409 F.3d 286 (6th Cir. 2005). The record does not support a finding that ALIC acted arbitrarily and capriciously in terminating Mr. Melenofsky's benefits.

Plaintiff relies heavily on the Sixth Circuit's decision in *Shaw* in arguing that summary judgment should be granted in his favor. There, the Sixth Circuit indicated that the review of evidence was severely lacking, that the decision not to conduct a physical examination was significant given the nature of the ailment at issue (chronic pain), and that the conflict of interest posed by the use of physician consultants was particularly concerning given prior litigation concerning one of the consultants in question. Three of the four lodestar factors indicated that the plan administrators made "flagrant errors," and therefore the overall analysis weighed in favor of finding that the plan acted arbitrarily and capriciously in denying benefits. *Shaw*, 795 F.3d at 551. Here, by contrast, none of the factors weighs so heavily against the plan.

18

In light of this finding, the Court need not address in-depth Plaintiff's argument concerning whether the Plan applied the wrong standard by asking whether Plaintiff was able to perform "any occupation" in determining his disability, rather than asking whether he could perform his "own occupation." ECF No. 25, PageID.921-24. Mr. Melenofsky has not raised a genuine issue of material fact as to whether the Plan applied the incorrect standard in a manner that materially affected his rights to benefits. He cites to an internal review that used the phrase "any occupation,"[5] but the review occurred early on in the timeline of Mr. Melenofsky's case and was part of a decision to *maintain* benefits. ECF No. 25, PageID.922. Therefore, even if the review was conducted using the "any occupation" standard, that would be a harmless error—if he was granted benefits during that period under the "any occupation" standard, he clearly would have qualified for benefits under "own occupation." He does not provide any evidence that the decision to *terminate* benefits—made after reviewers concluded from his medical records that his capacity for work had changed—was made under the "any occupation" standard. The issue for the Court is whether the decision-making process, using this standard and coming to the conclusion to terminate benefits, was arbitrary and capricious. It was not.

---

[5] He also cites to an internal notation in ALIC's system that appears to merely be a summary of Dr. Alkatib's first Attending Provider Statement, rather than an independent assessment. *See* ECF No. 17-2, PageID.376.

19

## CONCLUSION

For the reasons stated, Defendant's Motion for Summary Judgment (ECF No. 27) is **GRANTED** and Plaintiff's Motion for Summary Judgment (ECF No. 25) is **DENIED.** The case is **DISMISSED WITH PREJUDICE**.

**SO ORDERED**, this 29th day of September, 2021.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge